# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4366 | **DATE** | 3/25/2003 |
| **CASE TITLE** | Zenith Electronics Corporation vs. WH-TV Broadcasting Corporation | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry] Plaintiff's motion for summary judgment (270-1) is granted in part and denied in part. Defendant's motion for summary judgment (289-1) is denied. Enter memorandum and order. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | | |
|---|---|---|
| ✓ | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | MAR 2 6 2003 |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| SLB | courtroom deputy's initials | date mailed notice |
| | | mailing deputy initials |

Document Number

386

U.S. DISTRICT COURT
CLERK
03 MAR 25 PM 5:2

Date/time Received in central Clerk's Office



DOCKETED
MAR 2 6 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ZENITH ELECTRONICS CORPORATION, )
)
    Plaintiff/Counter-Defendant, )
)    01 C 4366
          v. )
)    Judge George W. Lindberg
WH-TV BROADCASTING CORPORATION, )
)
    Defendant/Counter-Plaintiff. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Zenith Electronics Corporation ("Zenith") brought this diversity action against

defendant WH-TV Broadcasting Corporation ("WH-TV"), alleging a state law claim of breach of

contract (Count I), and seeking a declaratory judgment as to the terms and conditions of the

contract between WH-TV and Zenith (Count II). WH-TV counterclaimed, alleging fraud in the

inducement (Count I) and breach of contract (Count II). Before the court is Zenith's motion for

summary judgment as to Count I of WH-TV's Third Amended Counterclaim, and WH-TV's

claim for lost profits damages. Also before the court is WH-TV's motion for summary judgment

with respect to liability on Count II of its Third Amended Counterclaim, and as to Count II of

Zenith's First Amended Complaint. For the reasons stated below, Zenith's motion is granted as

to Count I of WH-TV's Third Amended Counterclaim, and denied as to WH-TV's claim for lost

profits. WH-TV's motion for summary judgment is denied. However, pursuant to Federal Rule

of Civil Procedure 56(d), the court specifies that certain facts relating to WH-TV's breach of

contract claim and Zenith's declaratory judgment count are not in controversy and that partial

summary adjudication short of judgment is appropriate relating to those facts.



386

# I.    Factual Background[1]

WH-TV has broadcast wireless cable television service in Puerto Rico since 1987. By 1998, WH-TV had over 7,000 subscribers in the greater-San Juan area. In 1998, WH-TV decided to convert its analog system to a digital system, which would allow it to offer more channels to its customers. WH-TV believed it could increase its market share by being the first to offer digital programming to the market.

A digital wireless cable system has three components. First, "head-end" equipment receives signals from satellites, fiber optic cable, and conventionally-broadcast television stations, encrypts the information, converts it to a different frequency, and transmits it to a microwave tower for transmission into subscribers' homes. Second, a conditional access system encrypts the digital signal to prevent unauthorized access. Third, a set-top box ("STB"), which is connected to the customer's television, allows the television to receive and decode various channels. The STB also allows subscribers to access features such as electronic program guides, secondary audio programming, and closed captioning.

In 1998, WH-TV considered purchasing the STBs for its digital service from various companies, including Zenith. On August 28, 1998, WH-TV sent Zenith a request for a proposal for STBs. The request specified that the "digital format will be DVB." The term "DVB" refers to the digital video broadcasting standards or specifications established by the Digital Video Broadcasting Project, a European trade association. According to WH-TV, when the head-end

---

[1] The parties have filed numerous separate motions to strike various submissions made in connection with the motions for summary judgment. The court is issuing separate minute orders addressing these motions today. The facts contained in this opinion reflect the court's rulings on the motions to strike.

and STBs are configured to meet DVB standards, the system may use STBs made by different manufacturers; although Zenith disagrees that STBs could operate together in such a system without some modifications, it concedes that DVB standards are used for the purpose of minimizing such modifications. WH-TV states that it sought DVB-compliant equipment to allow it to use more than one source for the STBs, and thus obtain STBs on a competitive basis.

In September 1998, Zenith responded to WH-TV's request with a proposal for selling STBs to WH-TV. The proposal represented that its STBs were fully capable of meeting WH-TV's requirements. In addition, it represented that the STBs' conditional access subsystem, decoding and descrambling module, and service information table management were DVB compliant. Finally, the proposal guaranteed that the STBs would function as described in the proposal, and included a one-year warranty with a guaranty of a mean time between failures of 100,000 hours (the equivalent of more than ten years).

According to WH-TV, during the time it was negotiating the purchase of STBs from Zenith, and before it ordered any STBs, Zenith also promised to provide an electronic program guide with enhanced features, including a seven-day look-ahead feature. Zenith denies ever promising to deliver a seven-day look-ahead feature, and denies making a commitment to deliver an enhanced electronic program guide until after WH-TV had ordered STBs from Zenith.

Between May 3, 1999 and December 23, 1999, WH-TV sent Zenith four purchase orders for STBs. In response to these purchase orders, Zenith delivered to WH-TV a total of 8,404 STBs between either May or June 1999 and July 10, 2000, in fifteen shipments. WH-TV paid more than $2.6 million for the STBs.

According to WH-TV, the STBs did not work properly from the outset, and lacked

3

certain functions, such as an enhanced electronic program guide with a seven-day look-ahead feature. Zenith made efforts to fix some of the problems. From the time of the first deliveries of the STBs, through August 2000, Zenith delivered eight operating system upgrades, which WH-TV contends were an attempt to redress the STBs' problems. Zenith never provided an enhanced electronic program guide with a seven-day look-ahead feature. Meanwhile, on July 30, 1999, DirecTV, a large digital broadcasting service provider, entered the market in Puerto Rico.

In December 1999, WH-TV began contacting other STB suppliers and testing other vendors' STBs, with the intention of obtaining STBs from a supplier other than Zenith. One of these suppliers advised WH-TV in late December 1999 that Zenith's STBs were not DVB compliant. As a result, according to WH-TV, it was unable to purchase STBs from other vendors for operation in WH-TV's system alongside the Zenith STBs that were already deployed in subscribers' homes. According to WH-TV, because of defects in Zenith's STBs and WH-TV's inability to obtain and use working STBs from another vendor, it suspended or slowed its efforts to convert its existing subscriber base to digital service, and delayed or cancelled its sales and marketing efforts to attract new subscribers.

Zenith and WH-TV discussed making a transition to DVB compliance. In a July 14, 2000 letter, the president of Zenith's division responsible for making the STBs wrote to a senior vice president at Nagra, the company that supplied the conditional access system for the STBs, that "[i]t is acknowledged that it is in the best interests of the business to upgrade the current software to a fully compliant DVB version, for existing and future boxes."

In August 2000, Zenith sold the assets of its STB division to General Instrument. After the sale, General Instrument's parent company, Motorola, prepared a Preliminary DVB Migration

4

Plan for the Zenith STBs. That plan, like a February 2001 migration plan prepared by Nagra, recommended a "multicasting" solution that would allow the Zenith STBs to be used with STBs made by other vendors. Under the plan, the head-end would broadcast two signals simultaneously: one which could be read by the Zenith STBs, and the other which could be read by other vendors' STBs.

The modifications made under the multicast plan were completed in December 2001, allowing WH-TV to use STBs from other vendors. According to WH-TV, however, to date the STBs still are not fully DVB compliant. WH-TV maintains that its window of opportunity to entice new subscribers to its digital service had closed by the time its system was modified to allow it to use other vendors' STBs.

## II. Analysis

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party bears the initial burden of demonstrating that no material issue exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the nonmoving party must offer specific facts demonstrating that a material dispute exists, and must present more than a scintilla of evidence to support its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

### A. WH-TV's Breach of Contract Counterclaim

WH-TV seeks summary judgment as to liability only, on its counterclaim that Zenith breached its contract with WH-TV. According to WH-TV, Zenith breached its contract by providing STBs that were not DVB compliant, that were not stable and did not function as promised, and that did not contain an enhanced programming guide with a seven-day look-ahead capability. Zenith does not dispute that it had a contract with WH-TV to supply STBs, or that WH-TV paid for the STBs. Rather, Zenith contends that its STBs were DVB compliant, that they were not defective, and that it never agreed to supply an enhanced programming guide with a seven-day look-ahead capability. The court addresses these questions in turn.

#### 1. DVB Compliance

In its September 1998 STB Proposal, Zenith made the following representations regarding the DVB compliance of its STBs:

- "Zenith also has formed key technology relationships with leading providers of MPEG2/DVB compliant chip-sets to offer a fully standards based set-top box. These relationships have allowed the company to develop and market a competitively priced, high performance product that is fully capable of meeting WHTV['s]...requirements";

- The STBs "are designed to interact seamlessly with DiviCom's [WH-TV's head-end supplier] headend products";

- "Zenith's conditional access approach is based on international standards. The scrambling is DVB compliant (as is the modulation and forward error correction)";

- "The set-top box provides a Conditional Access subsystem compliant with...the Digital Video Broadcast (DVB) recommendations";

- "Fully DVB Compliant" decoding and descrambling module;

- "Zenith's approach fully leverages standards-based designs and technologies to

promote network interoperability. This approach provides the flexibility to 'mix and match' various components from many vendors to design and build the network to meet individual operators' specific business and technology requirements"; and

- "DVB compliant" service information table management.

According to WH-TV, Zenith's representations that its STBs were DVB compliant meant that the STBs would comply with DVB standards dated January 23, 1998, that had a "date of latest announcement" of May 31, 1998. DVB standards previously had been promulgated in 1995 and 1997. Although Zenith contends that its STBs, including the service information tables used by the STBs, complied with the 1995 DVB standards, Zenith concedes that the service descriptor and event information tables used by its STBs did not conform to the mandatory specifications for those tables as set forth in the 1998 version of the DVB specifications for service information tables.

Zenith argues that it met its obligation to provide DVB-compliant STBs under its agreement with WH-TV, because "DVB" does not require that the most current standards be used. Zenith observes that WH-TV never specified that it sought STBs that complied with the 1998 DVB standards, and Zenith's promises to supply DVB-compliant STBs do not specify that the STBs would comply with the 1998 standards. Zenith notes that the statement in its September 1998 Proposal that the SI Table Management is DVB compliant is prefaced by an introductory paragraph that directs the reader to another section for "a more detailed response." That corresponding section describes certain functions, but does not refer to the 1998 standards. Since the Proposal does not specify that the 1998 standards would apply, argues Zenith, it cannot be bound by those standards.

The court finds Zenith's argument absurd. While it is true that the September 1998 Proposal did not specify that the 1998 standards would apply, it also did not specify that the 1995 standards – or the standards of any particular year – would apply. It is a matter of common sense that unless otherwise directed, one looks to the latest rules or standards to guide one's actions.[2] Had Zenith wanted to be bound by standards other than the current ones, it could have explicitly provided in its proposal that its STBs would comply with the 1995 DVB standards. Zenith did not do so, and the court construes any ambiguity in the contract against Zenith, the drafter. See Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1036 (7th Cir. 1998) (under Illinois law, "any ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision").[3]

Zenith also argues that WH-TV should have understood that Zenith was proposing to comply only with the 1995 DVB standards, even though the proposal did not explicitly provide as such. According to Zenith, the STBs it proposed to supply to WH-TV were of the same type that had been sold to a consortium called Americast, and the Americast STBs complied with the 1995 DVB standards. However, Zenith offers no evidence that WH-TV would have known that Americast had requested STBs that complied with the 1995 DVB standards, or that Zenith was proposing to supply WH-TV with STBs with the same level of DVB compliance as those supplied to Americast.

---

[2] The 1998 standards also provide that "any conflicting National Standard" would be withdrawn on November 30, 1998. Although this could well be an indication that the 1998 standards superceded prior DVB standards, there has been no evidence offered on the meaning of "conflicting National Standard."

[3] Since neither party has argued that the law of another state should apply, the court applies Illinois law. See ECHO, Inc. v. Whitson Co., 52 F.3d 702, 707 (7th Cir. 1995).

8

Since the agreement between Zenith and WH-TV does not specify any year for the applicable DVB standards, the then-current DVB standards applied. The 1998 standards were in effect when WH-TV requested a proposal from Zenith, when Zenith made its proposal, when WH-TV sent its purchase orders for the STBs, and when the STBs were delivered. Therefore, under its agreement with WH-TV, Zenith was obligated to supply STBs that complied with the 1998 DVB standards. It failed to meet that obligation. The court concludes, as a matter of law, that Zenith breached its agreement to provide DVB-compliant STBs.

### 2. Functionality

WH-TV also claims that Zenith breached its agreement to supply STBs that were stable and that functioned as promised. In its September 1998 STB Proposal, Zenith guaranteed that the STBs would provide a mean time between failures of 100,000 hours. Zenith also represented that the STBs would support closed captioning. Zenith guaranteed that the STBs would function as described in the proposal.

From the outset, WH-TV experienced problems with its digital system that it attributed to Zenith's STBs. These problems included intermittent, undesired re-booting; locking up when the subscriber changed channels; a non-functional "last channel" feature (a feature that allows a viewer to toggle back and forth between two channels); and sudden loss of video. Other problems were subsequently discovered, including remote control failures; lack of closed captioning; lack of secondary audio programming; automatic, undesired shut-off in buildings with multiple units, such as hotels; failure to display event information; re-booting whenever the "Information" button was pressed; unexpected error messages; freezing of video on "digital turn-around" channels, such as HBO and Showtime; nightly video blink at 8:00 p.m.; and abnormal

9

function of various keys.

Zenith has offered evidence that at least some of these problems were not caused by defects in the STBs. For example, Zenith explains that some of the intermittent re-booting problems were caused when a WH-TV employee inserted an improper command at the head-end. According to Zenith, these intermittent re-booting problems were also linked to the problems experienced in hotels and other multiple dwelling units. Such buildings used multiple STBs at a central location, with each STB tuned to a different channel; when the intermittent re-booting problems occurred, the STBs would re-boot to a default setting and each would have to be manually reset. Zenith has also offered evidence that the problem subscribers had with locking up when changing channels was attributable to the RF carrier and head-end, or errors in the transport stream that was transmitted by the head-end. According to Zenith, the majority of problems with sudden loss of video was caused by the deactivation of customer accounts by WH-TV's billing management system. Zenith explains that the remote control failures were caused when WH-TV installers or customers activated sophisticated functions on the remote control that they did not know how to use. Zenith states that the lack of closed captioning and secondary audio programming was caused by WH-TV's use of digital turnaround equipment in its head-end. A genuine issue of material fact exists as to the extent to which the functionality problems experienced by WH-TV were caused by Zenith. Therefore, the court cannot conclude, as a matter of law, that Zenith breached its agreement regarding the functionality of the STBs.

### 3. Enhanced Program Guide

According to WH-TV, Zenith also breached its agreement to provide an enhanced electronic program guide that would allow viewers to look seven days ahead in a program menu

and sort the programs by category. Don Alexander, Zenith's former vice president and general manager of the division that made the STBs, testified that prior to the time that WH-TV issued purchase orders (that is, prior to May 1999), Zenith agreed to WH-TV's request that the STBs contain a seven-day look-ahead menu.

Zenith argues that a factual dispute exists on the issue of whether Zenith promised a seven-day look-ahead feature, and offers evidence that in July 1999 discussions of enhancements to the electronic program guide between Zenith and WH-TV, Zenith did not promise WH-TV a seven-day look-ahead feature in those discussions. However, Zenith does not refute WH-TV's evidence that Zenith had already promised to provide the seven-day look-ahead feature prior to these July 1999 discussions. In addition, while Zenith and WH-TV dispute whether Zenith promised to deliver an electronic program guide by a certain date (WH-TV contends that Zenith promised to deliver the guide by December 1999; Zenith contends that no delivery date was ever set), there appears to be no dispute that Zenith never provided a program guide with a seven-day look-ahead feature. Accordingly, the court concludes, as a matter of law, that Zenith breached its agreement to provide an enhanced electronic program guide.

Although the court has determined that WH-TV prevails on the portions of its breach of contract claim relating to DVB compliance and the electronic program guide, the court cannot enter judgment on less than an entire claim. See infra pp. 15-16 (discussing partial summary judgment). Accordingly, the court denies WH-TV's motion for summary judgment as to its breach of contract claim. However, the portions of that claim relating to DVB compliance and the electronic program guide have been decided as a matter of law in WH-TV's favor.

## B. WH-TV's Fraudulent Inducement Counterclaim

Zenith seeks summary judgment on WH-TV's fraudulent inducement counterclaim. The elements of fraudulent inducement are: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." Havoco of America, Ltd. v. Sumitomo Corp., 971 F.2d 1332, 1341 (7th Cir. 1992) (quoting Cotter v. Parrish, 520 N.E.2d 1172, 1175 (Ill. App. Ct. 1988)). For a fraudulent inducement claim to be actionable under Illinois law, a fraudulent statement generally must relate to an existing fact. HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 682 (Ill. 1989). "A 'statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation.' under Illinois law." Continental Bank, N.A. v. Meyer, 10 F.3d 1293, 1298 (7th Cir. 1993) (quoting Peterson Indus., Inc. v. Lake View Trust & Sav. Bank, 584 F.2d 166, 169 (7th Cir. 1978)).

WH-TV claims that Zenith fraudulently induced it to enter into a contract to purchase STBs by falsely representing that the STBs were DVB compliant. As this court has already found, Zenith represented in its September 1998 STB Proposal that the STBs' service information table management was DVB compliant, when the service information tables did not comply with applicable DVB standards. In addition, there is evidence that supports a conclusion that this false statement related to an existing fact: a manager of Zenith's digital support team testified that, to the best of his knowledge, in 1998 and 1999 Zenith did not manufacture an STB

12

that had DVB-compliant system information tables. WH-TV has adequately shown that Zenith made a false statement of an existing material fact.[4]

Zenith argues that WH-TV has offered no evidence that Zenith knew, at the time it made its representations, that the service information tables in its STBs were not compliant with the 1998 DVB standards. Zenith did not develop the software used in its STBs, but rather used software supplied by another vendor under a licensing arrangement. Zenith had specified to the software vendor that the technology should be DVB compliant. According to Zenith, it did not learn that its service information tables were not compliant with the 1998 DVB standards until mid-2000, when it made an outright purchase of the software used in its STBs.

WH-TV contends that fraudulent intent may be inferred from evidence that Zenith stated that its STBs were fully DVB compliant when they were not, coupled with evidence that at the time it made this representation it did not make a DVB compliant STB. Had Zenith developed the DVB software itself, the court might agree. See L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc., 9 F.3d 561, 573 (7th Cir. 1993) (observing that if defendant promised to provide a completely integrated system when it did not have integrated products, it would be clear that defendant knew that its statement was untrue). However, Zenith relied on a third party to supply the software, which Zenith in turn used in the STBs. Although WH-TV contends that Zenith learned that the STB software was not fully DVB compliant in December 1999, rather than in mid-2000, as Zenith contends, there appears to be no evidence that Zenith had actual knowledge that the software was not DVB compliant when it made its representations in its

---

[4] Since the court has concluded that WH-TV has shown that Zenith made a false statement of existing fact, it need not address WH-TV's alternative argument that Zenith made fraudulent promises as part of a scheme to defraud.

September 1998 Proposal.

Of course, even if a party does not knowingly make a fraudulent statement, its "statements made in culpable ignorance of their truth or falsity" also are fraudulent. <u>Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.</u>, 125 F.3d 468, 479 (7th Cir. 1997) (quoting <u>Duhl v. Nash Realty Inc.</u>, 429 N.E.2d 1267, 1274 (Ill. App. Ct. 1981)). Thus, if Zenith represented that its STBs were DVB compliant, with reckless disregard for the truth of that representation, it still may be liable for fraud. See <u>Duhl</u>, 429 N.E.2d at 1274. WH-TV argues that Zenith made its statements in culpable ignorance of their falsity when it relied on its vendors to provide DVB-compliant software, without making any independent effort to verify that the software was in fact DVB compliant, especially given that the issue of DVB compliance was important to WH-TV's decision to buy the STBs from Zenith. The court concludes that this is insufficient evidence that Zenith made its representations with reckless disregard for their truth. While this evidence could support a finding that Zenith negligently made its representations that its STBs were DVB compliant, "negligence does not translate into fraudulent intent." <u>L.S. Heath & Son, Inc.</u>, 9 F.3d at 573. Summary judgment is granted in Zenith's favor on WH-TV's fraudulent inducement claim.

## C.    Lost Profits

WH-TV moves for summary judgment on Count II of Zenith's First Amended Complaint, in which Zenith seeks a declaratory judgment that the terms contained in Zenith's sales orders, including a limitation of liability provision, are terms of the agreement between Zenith and WH-TV. Zenith seeks summary judgment on WH-TV's "claim" for lost profits, contending that even if the limitation of liability provision does not apply, WH-TV nevertheless would not be entitled

to lost profits.

The court first notes that in moving for summary judgment as to the issue of lost profits (a potential remedy for plaintiff's causes of action), Zenith's motion improperly asks the court to enter summary judgment on a portion of a claim. Federal Rules of Civil Procedure 56(a) and (b) authorize only the granting of a "judgment." A "judgment" is an "order from which an appeal lies." Fed. R. Civ. P. 54(a). An appeal may not be taken of an adjudication disposing of something less than a single claim, see Fed. R. Civ. P. 54(b), although in some circumstances an appeal may be taken of a finding of liability. See Parks v. Pavkovic, 753 F.2d 1397, 1401-02 (7th Cir. 1985). Thus, Rules 56(a) and (b) "simply do not permit the...type of issue-narrowing sought here." See Arado v. General Fire Extinguisher Corp., 626 F. Supp. 506, 509 (N.D. Ill. 1985).

Nor does Rule 56(d) authorize bringing an independent motion to dispose of a disputed issue. Rule 56(d) allows a court to enter an order "specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy...." However, such an order may be entered only "[i]f on motion under this rule judgment is not rendered upon the whole case or for all the relief asked...." Fed. R. Civ. P. 56(d). This procedure thus is "designed to be ancillary to a motion for summary judgment," for the "primary purpose of...salvag[ing] some results from the effort involved in the denial of a motion for summary judgment." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2737 (3d ed. 1998). Accordingly, the court denies Zenith's motion for summary judgment on the issue of WH-TV's entitlement to lost profits.

The court turns to WH-TV's motion for summary judgment as to Count II of Zenith's First Amended Complaint. Between May 3, 1999 and December 23, 1999, WH-TV sent Zenith

four purchase orders for STBs. According to Zenith, in response to each of the four purchase orders, and prior to the delivery of the STBs ordered under each purchase order, it sent to WH-TV sales order acknowledgments. Each sales order acknowledgment contained a provision limiting Zenith's liability, and WH-TV's remedy for breach, to repair or replacement of defective or nonconforming goods. The acknowledgments also stated that:

> [u]nder no circumstances shall seller be liable in any way for indirect, special or consequential damages, including but not limited to lost business or profits, whether or not such damages are foreseeable, whether or not seller has been advised on the possibility of such damages and whether or not such damages are based on breach of warranty, contract, or tort.

WH-TV concedes that it received the sales order acknowledgment sent in response to the fourth purchase order, but denies receiving sales order acknowledgments for the first three purchase orders.

Evidence of proper mailing creates a rebuttable presumption of delivery. Godfrey v. United States, 997 F.2d 335, 338 (7th Cir. 1993). Zenith has no direct evidence that sales order acknowledgments were mailed in response to WH-TV's first three purchase orders. Thus, to invoke the presumption of delivery, Zenith must show that it had a general office practice regarding mailing, and that this practice was actually followed in mailing the sales order acknowledgments. See First Nat'l Bank of Antioch v. Guerra Constr. Co., 505 N.E.2d 1373, 1376 (Ill. App. Ct. 1987).

Zenith's general practice was that upon receipt of a purchase order, a customer service representative would verify the price information and model number, then enter the information into the computer system. A sales order acknowledgment was then printed out on white paper, and copied onto colored paper. The acknowledgment bore the date on which it was printed. The

colored copy would be sent to the customer shortly after the print date. It was not common practice for it to take substantially longer than one week to generate a sales order after the purchase order was received, although according to Zenith the delay would be longer in situations in which a customer was requesting test samples, in which the order was the first "quantity order" for a product, or in which a holiday intervened. Zenith's practice was to retain at least one copy of a sales order acknowledgment, and occasionally extra copies would be made on colored paper and placed in Zenith's file.

WH-TV sent its first purchase order, for 100 STBs, to Zenith on May 3, 1999. Zenith shipped these STBs in two shipments, between either May and June 1999, and July 30, 1999. Zenith has offered no evidence showing that it followed its procedure for mailing sales order acknowledgments in response to this purchase order. No acknowledgment relating to this purchase order was produced in discovery from Zenith's files, which had been transferred to Motorola at the sale of Zenith's STB division. The court finds that there is no genuine dispute that no sales order acknowledgment was delivered in response to the first purchase order.

According to WH-TV, it sent the second purchase order, for 300 STBs, to Zenith on May 11, 1999. The STBs were shipped on January 19, 2000. According to Zenith, it did not receive the purchase order until November 16, 1999. Two copies of a sales order acknowledgment in response to the second purchase order were found in Zenith's files (at Motorola). Both copies bore the printing date of December 1, 1999 and were on colored paper. The court finds that a reasonable jury could conclude that Zenith received the purchase order in November 1999, and that a fifteen-day period between receiving the purchase order and generating the sales order acknowledgment was not "substantially longer than one week," especially given the intervening

Thanksgiving holiday. Accordingly, a jury could conclude that Zenith followed its standard practice and sent WH-TV a sales order acknowledgment prior to shipping the STBs, keeping additional colored copies in its files.

WH-TV sent its third purchase order, for 6,500 STBs, to Zenith on May 25, 1999. These STBs were shipped in eight shipments between July 30, 1999 and January 19, 2000. Three copies of sales order acknowledgments in response to the third purchase order were found in Zenith's files (at Motorola). All were on colored paper; two bore the printing date of June 10, 1999, and the third copy bore the printing date of November 30, 1999. As with the second purchase order, the court concludes that a reasonable jury could find that a sales order acknowledgment was generated on June 10, 1999, and that the sixteen-day period between the time the purchase order was sent and the sales order acknowledgment was generated was not substantially longer than one week. Again, a jury could conclude that Zenith followed its standard practice and sent WH-TV a sales order acknowledgment prior to shipping the STBs, keeping additional colored copies in its files.

WH-TV sent its fourth purchase order, for 2,000 STBs, to Zenith on December 23, 1999. Fifteen hundred STBs were shipped between May 5, 2000 and July 10, 2000.[5]  Three copies of a sales order acknowledgment in response to the fourth purchase order were found in Zenith's files (at Motorola); all three were on colored paper and bore a printing date of January 5, 2000.

---

[5]  Although WH-TV claims that an additional four STBs were shipped in early January 2000 pursuant to the fourth purchase order, Zenith states that these STBs were only a "sample." Since WH-TV elsewhere states that the remaining 500 STBs ordered under the fourth purchase order were never shipped, and 1,500 STBs were shipped, it would appear that the four STBs shipped in January 2000 were not part of the 2,000 STBs ordered under the fourth purchase order.

Zenith's account administrator responsible for WH-TV's account recalls mailing this sales order acknowledgment to WH-TV for a second time on January 10, 2000. WH-TV concedes that it received this sales order acknowledgment. Although WH-TV has offered evidence that it found this acknowledgment in its files in April 2001, it does not claim not to have received it shortly after it was sent.

The court next considers the effect of WH-TV's receipt of the January 2000 sales order acknowledgment containing the limitation of liability provision. Section 5/2-207 of Illinois' version of the Uniform Commercial Code governs whether an additional term becomes part of a contract. That section provides that, between merchants, such additional terms become part of the contract unless:

> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

810 ILCS 5/2-207(2). There is no dispute that both Zenith and WH-TV are merchants, that WH-TV's purchase order does not expressly limit acceptance to its terms, or that WH-TV did not notify Zenith that it objected to the limitation of liability provision in the January 2000 sales order acknowledgment. Therefore, the only issue is whether the limitation of liability provision materially altered the agreement between WH-TV and Zenith.

In Southern Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co., 302 F.3d 667, 674 (7th Cir. 2002), the Seventh Circuit observed that the Illinois Supreme Court has not addressed the issue of whether a remedy limitation may constitute a material alteration of a sales contract under Section 5/2-207, and that the two Illinois Appellate Court decisions on the

19

question, from different divisions of the First District, are inconsistent with each other. One Illinois Appellate Court decision holds that an additional term limiting remedies is a <u>per se</u> material alteration of a contract. <u>See Album Graphics, Inc. v. Beatrice Foods Co.</u>, 408 N.E.2d 1041, 1048 (Ill. App. Ct. 1st Dist. 1980). The other decision establishes a <u>per se</u> rule against treating any remedy limitation as a material alteration. <u>See Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc.</u>, 733 N.E.2d 718, 723 (Ill. App. Ct. 1st Dist. 2000). In evaluating these cases, the Seventh Circuit concluded that the <u>Intrastate Piping</u> holding gives effect to the comments to the U.C.C., while the <u>Album Graphics</u> holding does not. <u>Southern Ill. Riverboat Casino Cruises, Inc.</u>, 302 F.3d at 675. Accordingly, the court held that "after <u>Intrastate Piping</u> a remedy limitation cannot, as a matter of Illinois law, constitute a material alteration of a sales contract under § 5/2-207." <u>Id.</u> at 676.

WH-TV argues that <u>Southern Ill. Riverboat Casino Cruises, Inc.</u> is factually distinguishable from the present case because the purchaser in that case was aware of the remedy limitation and therefore was not surprised by it. However, in <u>Southern Ill. Riverboat Casino Cruises, Inc.</u>, the court noted that the question of whether a remedy limitation constituted a material alteration of a sales contract under Section 5/2-207 is "purely a question of law," and that both the Album Graphics and Intrastate Piping courts had so concluded. <u>Id.</u> at 675-76. The <u>Southern Ill. Riverboat Casino Cruises, Inc.</u> court accordingly rejected the plaintiff's argument that <u>Intrastate Piping</u> should not apply because it presented a different factual situation. <u>Id.</u> at 676.

For the same reason, this court concludes that the liability limitation provision in the January 2000 sales order acknowledgment sent to WH-TV is not a material alteration to the

20

agreement between WH-TV and Zenith. Therefore, that provision bars WH-TV from recovering lost profits as to the STBs shipped pursuant to the fourth purchase order.

Finally, Zenith argues that the terms of the January 2000 sales order acknowledgment apply not only to the STBs shipped pursuant to the fourth purchase order, but also to the STBs shipped pursuant to the earlier purchase orders. However, the January 2000 sales order acknowledgment responds to the December 23, 1999 purchase order, and therefore its terms apply only to the shipments made under that order.

Since a material factual dispute exists as to whether WH-TV received sales order acknowledgments in response to its second and third purchase orders, the court denies WH-TV's motion for summary judgment as to Count II of Zenith's First Amended Complaint. However, the court has decided, as a matter of law, that the liability limitation provision contained in Zenith's sales order acknowledgments does not apply to the STBs shipped pursuant to WH-TV's first purchase order, as there is no evidence that WH-TV received a sales order acknowledgment with respect to that purchase order. In addition, the court has decided, as a matter of law, that the liability limitation provision does apply to the STBs shipped pursuant to WH-TV's fourth purchase order.[6]

**ORDERED:** Zenith's motion for summary judgment [270-1] is granted in part and denied in part: the motion is granted as to Count I of WH-TV's Third Amended Counterclaim and denied as to WH-TV's claim for lost profits. WH-TV's motion for summary judgment [289-

---

[6] In a minute order entered today, the court has granted Zenith's motion to strike WH-TV's argument made for the first time in its reply brief, that the limitation of remedies provision is unenforceable under Section 2-719 of the U.C.C. Therefore, the court does not address that argument in this opinion.

1] is denied.

ENTER:

George W. Lindberg
Senior U.S. District Judge

DATED: MAR 2 5 2003